The next case is Daisy Miller v. United States. Gennaro Coriglio is here for the appellant, Miller. Jeremy Sanders is here for the government. And, Mr. Coriglio, you may begin when you're ready. Good morning. Good morning. May it please the court. Good morning, Mr. Coriglio. Good morning, Judge. Jerry Coriglio on behalf of Daisy Miller. Because she was indigent, Daisy Miller wasn't entitled to her counsel of choice, but she was entitled to constitutionally competent counsel. And in this case, counsel's performance was objectively unreasonable, precisely because the investigation itself was unreasonable. When court-appointed counsel was appointed to this case at the time of the arraignment, it was clear from the indictment that the charges against Daisy Miller mainly focused on the patient side of the business, and not so much on the financial side of the business where one of the co-defendants was in charge of, the owner of the business. So here, the magistrate got it wrong in his R&R when he gave deference to trial counsel's strategic decisions. Because here, under Wiggins v. Smith, the strategic decisions of trial counsel should not be entitled to any deference because they weren't informed strategic decisions. Well, that conflicts with our decision in Waters v. Thomas where we said the epitome of a strategic decision is one that we will seldom, if ever, second-guess. And I believe that Mr. Malone testified at the evidentiary hearing that he interviewed several of these witnesses, right? There were nine witnesses that she said that Mr. Malone should have called on her behalf, and some of these were interviewed by Mr. Malone, and he came to the conclusion that their testimony would be counterproductive because they would be cross-examined and it would hurt his client's case. That seems to me to be the epitome of a strategic decision. Why is that conclusion incorrect? Well, it would be the epitome of a strategic decision if trial counsel knew exactly what was going on here, if he conducted a reasonable investigation. He didn't start... Yeah, it would not be a strategic decision if he just didn't interview these witnesses or take into consideration what they would say if they were called as witnesses, but that's exactly what he did here, right? No. No, Woody, and it starts with the medical expert or the failure to even get a medical expert. Well, so hold on, wait. I just want to make sure we're all on the same page. So he did interview three or four, right? That's the record evidence? He did interview three or four witnesses. He couldn't recall specifically what they said. And a couple of those... Do you know that she gave him some thumbnail sketch of what each of these folks might say? It wasn't just a thumbnail sketch. The magistrate specifically found, there is little doubt that Miller proved to be a diligent client who supplied Malone with comprehensive memoranda, including detailed lists of witnesses and comments about their likely assistance. See, I actually think that that's a double-edged sword. That shows that he had the information, more than a thumbnail sketch, a summary of what each of these witnesses might say, and decided not to call them. It was an informed decision, right? And so doesn't that make it strategic? No, because it wasn't an informed decision. Reason why it wasn't an informed decision, it stems from these witnesses, the patients that were on the floor. All of the witnesses that testified at the 2255 hearing, Mr. Malone did not have any contact with, except a brief exchange with Rita Sordinelli, and a brief exchange through email with Mr. Liano. So he wasn't informed of what they were going to say, and when he was questioned about these witnesses at the 2255, he really didn't have an idea of what they were going to say. And the reason why he didn't have an idea of what they were going to say is because right from the outset of this case, he never got his own medical expert. The brunt of the case against Ms. Miller was the fact of the patient side of the business was largely a fraud. Dr. Gumer testified that less than 1% of these patients needed to be there. So the first line of defense in this particular case was to get a medical expert. There were two specific counts in this case, count seven and eight, where there were two specific patients listed. So the first starting point would be as a Criminal Justice Act attorney to ask the court to, because it's going to go over the cap in this particular case, to ask the court to approve a medical expert so they can review patient files, a random selection of patient files. I have a question, Mr. Corriglio, because my understanding of the evidence is that the evidence against Ms. Miller was not just based on the patient side, but also on the fact that she interacted with recruiters and recruited individuals in order to bring these fake patients to the clinic. Right. There was, there was testimony of that by Mathis Moore and Keith Humes. Dr. Danziger would not have mattered to that testimony, correct? Because he didn't have any interaction with recruiters. Dr. Danziger would not have mattered to those two witnesses, but at the end of the day, because of this lack of investigation, all the jury was left with was the government's witnesses against Ms. Miller and Ms. Miller herself. Whereas had there been a reasonable investigation, there could have been a medical expert put on to say that of the 36 patient files I reviewed, or the 36 files I reviewed of 19 patients, there was no evidence of fraud. Everything was internally consistent and it would stretch credibility to have 15 to 18 licensed healthcare professionals all in on this. But wasn't one of the issue about the patients was that the, there was a high number of out had comorbid dual diagnosed patients and that that was very unusual. Right. That was, that came from Dr. Triplett, but Dr. Triplett was not shown any patient files in this case. And there were never any patient files introduced by the government. He just looked at the overall statistics. He didn't look at the particular business of HP. And here, Dr. Danziger or a medical expert could have addressed the fact that all of these patients, because the essence of the claim was the patients didn't need to be there. Dr. Danziger would have specifically rebutted that to say the patients didn't need to be there of all the patient files I reviewed. And if you think about it, one of the big concerns of the magistrate below was as well, Dr. Danziger only reviewed a select number of the files. But when you look at, at the fact that Dr. Groomer said it was over 99% of the files or 99% of the patients didn't need to be there, it would be statistically very unlikely that you'd pick 36 files in a row that, Hey, these patients did need to be there. So I think Dr. Danziger- Dr. Groomer also testified that Miller instructed him to indicate severe symptoms and pathology in patient charts. It seems, I mean, there's overwhelming evidence, even without a medical expert. You had Mathis Moore, Keith Humes, Gloria Hymans, they were patient recruiters. They all implicated Miller as instructing them to improperly refer patients. So I don't see how you get around, even if there was deficient performance for failure to call these nine witnesses, how you get around the prejudice prong of Fricklin versus Washington. Very easily in this particular case, had you relied on the witnesses that Ms. Miller gave you. Think about what Dr. Groomer is saying. Dr. Groomer is saying everybody in here does not belong in here, just about over 99%. So what do you want to do as a defense attorney? You want to go out there, you want to interview people that were on the floor. And these were the people that appeared at the 2255 hearing, because everybody knows all of us have worked in a different type of workplace. You know, the average person knows that if something's going on, if it's obvious, like Dr. Groomer is saying, that you would know that it's going on. So what do you do? You go out and talk to those people. And that's what trial counsel didn't do. Robin Smith was never contacted or interviewed, despite the fact that she was on the witness list. She was there the entire time. She could have rebutted everything Dr. Groomer had to say. But Robin Smith also conceded at the hearing that she didn't know if HP's marketers were actually recruiters who were paid to bring patients to HP. She was not present for any of the meetings that Miller had with the recruiters. I mean, I guess for me, the big issue is the prejudice prong, and I'm not sure how you get around the testimony of the recruiters who testified that she was recruiting them to bring patients who were, in essence, drug addicts, and was told to, you know, not just indicate that they had drug issues, but that they had other issues in order to have them brought in into HP. Yeah, I think you have to think of the big picture of what these jurors were left with because of the lack of investigation, right? You have the patient recruiters saying one thing, and you have Daisy Miller uncorroborated saying, I didn't do that, right? You have Mathis Moore and Keith Humes saying Daisy knew we were paying patients, and you have Daisy Moore taking the stand and saying no. So that was all the more reason why these other witnesses would have led to a different, there would have been a reasonable probability of a different result because now if you have all the people that were there on the floor living this day to day that said, no, there was no fraud going on here, it would have lent credibility to Daisy Moore's denial that she didn't know that patients were being paid, and keep in mind that one of the things that Ms. Miller requested her counsel to do was contact HP's attorneys and get those marketing contracts because that's one of the things that the co-defendants' attorneys was doing. They were trying to show there were legitimate marketing contracts that were reviewed by a major law firm with offices all over the country. So that's why it would have been different, and that's why there's prejudice in this case. All right. Thank you, Mr. Gariglio. We'll hear from Mr. Sanders. May it please the Court. Jeremy Sanders of the Department of Justice on behalf of the United States. Your Honors, after an evidentiary hearing that featured the testimony of several witnesses, the magistrate judge in this case issued a report and recommendation that the district court characterized as thorough, exhaustive, and persuasive, and that concluded that Daisy Miller had failed to demonstrate that her experienced trial counsel rendered constitutionally ineffective assistance when he made the strategic decision not to call any other witnesses other than Ms. Miller on her behalf at her trial. The district court adopted the report and recommendation in full and denied 2255 relief. This court should affirm that decision. Now specifically, the magistrate judge- Fifteen years in prison for some serious crimes. Never been in any trouble before, and you can't call a single witness on her behalf at the trial? I think that- She got 15 years in prison, and you couldn't call a single witness? I think Mr. Malone testified at the evidentiary hearing as to his thinking in that regard, and he had two sort of bases for his reasons for not calling any other witness. The first was that in his mind, a case of this nature, where it's based on the willfulness of the defendant's conduct or her good faith belief, it's going to rise and fall with Ms. Miller's testimony alone. He described her as the best advocate and conduit to present that defense and the strongest witness in the courtroom. And then secondly, he testified that his concern was his ability to limit the government's efforts to represent its entire case through cross-examination of these witnesses who were vulnerable in that aspect because, as Judge Lagoa noted earlier, they didn't have anything to do with the marketing aspects of the business at Hollywood Pavilion, which was the backbone of the government. She was on her own. She had nine other potential witnesses who could have corroborated some of her testimony, and even if they were character-type witnesses, not a single witness? Well, Ms. Kalinzuri, her co-defendant, presented two character witnesses, and we know that didn't make a difference in the jury's determination either because it convicted her of all counts as well, just as it did Ms. Miller. I was referring at the start of my presentation to the constitutionally deficient performance prong of Strickland, which the magistrate judge determined that Ms. Miller failed to demonstrate that was incorrect. Malone called it a balancing act in effort to the benefit of their direct testimony and any marginal relevance and benefit it may have versus the detriment that could come through cross-examination. I would stress that the defendant has the obligation to establish that no competent counsel would have taken the action that her counsel took, and as this court stated and as Judge Wilson noted in Walter Waters v. Thomas, the decision whether to call witnesses is the epitome of a strategic decision. That's what we entrust trial counsel to make a decision based on. Can I ask you a question with regards to Smith, Piercy, Hunter, and Calabria? I think Malone admitted that he had never spoken to them, correct? That's correct. What about that? Or he did not recall speaking to them. Isn't that a failure to adequately investigate? Well, this court has said that there's no obligation to interview all witnesses in a case and that the court counsel has to make a strategic decision based on the availability of time and effort, and I would note, as Judge Newsom noted earlier, the fact that Ms. Miller had provided such a fulsome list of possible witnesses with what the relevance of their testimony had been cuts against Ms. Miller in this case because Mr. Malone had that evidence in advance and he could say, is it worth my time to interview, say, Ms. Smith versus Mr. Yano versus focus on the efforts of joint defense counsel to build up the testimony of Dr. Danziger? What about having another medical expert testify? Well, I note that she has proffered no other medical expert as part of the evidentiary hearing, so what another medical expert might say would be wholly speculative, but I think it's completely reasonable to rely on a joint defense counsel agreement where one member of the joint defense agreement is responsible for preparing the expert witness, and at the time that Mr. Pinzano, Ms. Kalinzuri's attorney, determined that he was not going to call Dr. Danziger, Mr. Malone stepped in and did have the conversation with him, did speak to him in depth about his testimony, and he explained that he was not satisfied by some of his answers, particularly with respect to the fact that he would have to admit that it's a problem for patients to be coming as far away as Maryland and Louisiana, and that he had no answer for that. Similarly, that his testimony, he would not be able to testify whether the records, the information in the records that he reviewed was accurate or not, that that was an assumption of his, and that was something that bothered Mr. Malone and felt like that would damage his credibility and he would not be a useful witness on the defense's behalf. As to deficient performance, I would note two additional points, excuse me, as to prejudice, which of course, as this court did with Ms. Kalinzuri's 2255 appeal earlier this year, can resolve on the basis of lack of prejudice alone. I would note that the, as the R&R recorded, the potential testimony that a witness was not personally asked to participate in the file manipulation does not negate evidence that Miller directed some other employees to falsely fabricate, falsify files, excuse me. And there was evidence that therapist Marcy Hagan was told to stress the negative by Daisy Miller, that other recruiters were told to have their patients upon admission to falsify diagnoses of psychiatric conditions and to stress that they were off their meds, that they were suicidal. But the most important thing, which I think this court recognized in the Kalinzuri appeal is that none of these witnesses that she proffers at this point could have rebutted that evidence about patient recruiters and the fact that Hollywood Pavilion paid recruiters to bring Medicare witnesses to the services. None of those witnesses were involved in the meetings that Ms. Miller and Ms. Kalinzuri and other Hollywood Pavilion employees had with those recruiters in which they explained the need to keep the census up, the need to bring patients that have Medicare, the importance of the Medicare days that they had left on that. There are no other questions. We would ask that we will rest on the arguments in our brief and we would ask this court to affirm. All right. Thank you, Mr. Sanders. We'll hear from Mr. Carriglio. Thank you. Trial counsel's reasoning for not calling these witnesses was just a general fear of cross-examination. The magistrate noted there was nothing specific about why you didn't call a particular witness and basically the rationale, which is unreasonable, is, well, we were afraid that the government would rehash all the damaging parts of their case on cross-examination, which is not necessarily within the scope of cross-examination and it shows the fact that he really didn't have a full picture of what was going on. And while Ms. Miller supplied him with a comprehensive list, reading your client's list is not an investigation. It may be familiarizing yourself with the case, but it's not an investigation. If you look at these lists, you'll see they even had phone numbers. You know, so why wouldn't a reasonably competent counsel call up someone that was on the floor that could say that there was nothing inappropriate going on here? Why not just pick up the phone or have your investigator pick up the phone? There's just no reason for it. And I think that the performance prong is clear. With respect to the prejudice prong, once again, with respect to these patient recruiters, you have a bunch of convicted felons. Look at the witnesses that Ms. Miller would have been able to put forward. One of the witnesses who Mr. Malone briefly contacted through an email and then never followed up with, never had a detailed in-depth conversation, Rita Sordellini, was the Dean of Students of Barry University. And she would have came in and said, there was nothing inappropriate that I saw that was going on here. Daisy Miller never told me to do anything inappropriate. That was the sum and substance of all of these witnesses' testimony. So how does that apply to the patient recruiters? Well, when a juror goes back into a jury box to deliberate, they're going to be thinking overall about the big picture, all they've heard in these month-long trials. We got the government, you know, with their convicted felons, where a jury instruction that says we have to consider these witnesses with great caution and care versus witnesses that Daisy Miller put forward or should have put forward, such as the Dean of Students of Barry University, who was there on the floor. And I think that would have made a difference. Certainly there's a reasonable probability that that would have made a difference in this particular case. So it's our position that there definitely is prejudice in this case, because it would have been a whole different world to not have Daisy Miller sit there uncorroborated when we could have had all the people that were on the floor that were living this day-to-day say there was nothing wrong going on here. And to try to compare it to Kalantzuri is comparing apples and oranges. Kalantzuri was the owner of HP. Kalantzuri had a motive. The other thing that wasn't investigated in this case, even though Ms. Miller gave counsel the list, was the fact that they could have easily defeated the government's claim of motive. The government freely admitted in their opening statement that Ms. Miller didn't get any extra compensation for this. She just got her salary. What the government's opening statement was, was that Ms. Miller did this to keep her job. And there were two witnesses that weren't contacted by the trial counsel that would have said Ms. Miller actually could have, was offered a couple of jobs during that time period and she wanted to stay at HP. So a competent counsel could have put forth witnesses that would have led to a reasonable probability of the result being different just by defeating the government's motive. Because all the government's evidence on motive was what the prosecutor said in opening statement. The government didn't introduce any evidence of motive. So for those reasons, we'd ask that you reverse Ms. Miller's conviction and send it back to the district court so she can get a fair trial where the jury can consider everything that happened here and render a fair verdict. Thank you. Thank you, counsel. Thank you. Thank you, Mr. Craven. The court is in recess until 9 p.m.